# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CHARLENE BYNUM, individually as the wife of RONALD BYNUM, and as the Guardian of the Person and Estate of RONALD BYNUM,<br><br>     Plaintiff<br><br>v.<br><br>CITY OF NORTH LAS VEGAS, et al.,<br><br>     Defendants | Case No.: 2:17-cv-02102-APG-VCF<br><br>**Order on Motions for Summary Judgment**<br><br>[ECF Nos. 167, 171] |

Ronald Bynum (Bynum) was arrested on the afternoon of February 25, 2016.  Three days later, Bynum suffered a cardiac arrest while in custody at the Las Vegas Detention Center.  He was transported to Sunrise Hospital and diagnosed with an irreversible brain injury.  He remains in a coma and lives in a long-term care facility.  Bynum's wife, plaintiff Charlene Bynum (Charlene), individually and as the administrator of her husband's estate, sues various officials under federal and state law for their alleged roles in Bynum's arrest and detention, which she alleges caused his injury.  These officials can be distinguished as follows: (1) North Las Vegas (NLV) police officers, (2) NLV fire department emergency medical technicians (EMTs), (3) jail officers, and (4) Correct Care Solutions (CCS) nurses.  She also sues the cities of Las Vegas (LV) and NLV for municipal liability.

The NLV defendants move for summary judgment on all claims and the LV defendants join their motion.  The CCS defendants also move for summary judgment on all claims and the LV defendants join their motion.  For the following reasons, I grant the defendants' motions.  However, because the CCS defendants' arguments regarding the state law denial of medical care

claim do not pertain to the LV defendants, I will allow one final round of summary judgment so that the LV defendants and Charlene can address the intentional or negligent denial of medical care claim.

# I. BACKGROUND

## A. Incident at Bynum's Residence

On February 25, 2016, defendant NLV police officers Jacob Ray, Jesse Cesena, and Rodrigo Delara were dispatched to Bynum's house about a burglary. ECF No. 167-1 at 4.  When they arrived on the scene, Bynum, then 55 years old, explained that there was a person named John in his house. *Id.*  Bynum was speaking rapidly and not in clear sentences. *Id.*  The officers checked the house and found no one inside. *Id.*  However, they found marijuana in plain view on a nightstand in the master bedroom. *Id.*  When the officers exited the house, Delara and Cesena asked Bynum if he had a medical marijuana card. *Id.*  According to Cesena, Bynum became agitated, said he did not have marijuana or a medical marijuana card, started yelling, and resisted when the officers attempted to grab hold of him and prevent him from re-entering his house. *Id.* A struggle ensued between Bynum and the officers. *Id.*  Defendant NLV officer John Tonry arrived on the scene to assist. *Id.*

While Bynum was on the ground, he twisted his body and put his arms under his body so the officers could not place him in handcuffs. ECF No. 167-2 at 3.  Tonry believed Bynum might be going for a weapon and attempted to strike him, but instead punched the driveway and broke his hand. ECF No. 167-5 at 4.  After two warnings, Ray tased Bynum in drive stun mode directly against the top of Bynum's right buttock. ECF No. 167-2 at 3.  Ray asserts that Bynum did not react to the drive stun. *Id.*  Delara and Tonry were able to place Bynum in handcuffs. *Id.*; ECF No. 167-5 at 7.  They patted him down and escorted him to the police vehicle. ECF No. 167-5 at

7.  Bynum sustained injuries during the incident, including a cut below his right eye and scrapes to his right wrist. ECF No. 167-1 at 4; *see also* ECF No. 167-3 (images of Bynum's injured face).  He was advised of his *Miranda*[1] rights and admitted that the marijuana belonged to him.[2] ECF No. 167-1 at 4.

Ray called for medical assistance. ECF No. 167-5 at 7.  Tonry testified that it is policy to call for medical assistance when a suspect has been tased. *Id.*  The NLV Fire Department responded and were at the scene for about eight minutes. ECF. No. 178-2 at 2. According to the Fire Department's report summary, Engine 53 was called to assess a trauma and traumatic injuries, the officers at the scene requested an ice pack for an officer, and the EMTs left. *Id.* There is no mention of Bynum in the report.  Defendant EMT Scott Nielson testified that the officers advised him and defendant EMT John Lansing that there was an individual in the police car who needed to be checked out for medical complaints. ECF No. 167-4 at 7.  The EMTs were not informed that Bynum had been tased. *Id.* at 8.  Nielson asked Bynum if he had any injuries, pain, or medical complaints and he said no, but that he did not understand why he was being arrested. *Id.* at 7, 10.  Bynum was cleared to remain in police custody and was transported to jail.[3] *Id.* at 11, 13; ECF No. 167-1 at 4.

/ / / /

/ / / /

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] Charlene disputes that marijuana was found in Bynum's residence or that Bynum admitted to possession. *See* ECF No. 182 at 5.  She argues that the defendants have produced no marijuana in this action and Bynum stated initially that the marijuana was not his. *Id.*

[3] Charlene disputes that Bynum was treated or cleared to go to jail rather than a hospital.  She asserts that Ray's report is false because the Fire Department's report makes no mention of Bynum. ECF No. 182 at 3.

### B.  Bynum's Treatment at Las Vegas Detention Center

At the jail, non-defendant nurse Jenifer Swan filled out the pre-booking questionnaire. ECF No. 171-3 at 4.  She observed that Bynum was acting nonsensical and he stated he was Michael Jackson, but that there were no signs of physical distress and his temperature was 97.9 degrees. ECF No. 171-2 at 2.  According to an internal investigation report summarizing video footage, Bynum was then secured via waist restraints to a metal bench in the intake area, provided a meal he did not eat, and remained there for about ten hours. ECF No. 178-4 at 6. During that time, he was released from the bench three times to go to a drinking fountain and to use the restroom. *Id.*  At 6:35 p.m., defendant LV Sergeant Brian Griffith placed Bynum in administrative isolation pending a psychiatric evaluation. ECF No. 178-3 at 2.  Non-defendant nurse Veronica Sell made a progress note at 10:36 p.m. that Bynum had no physical injuries or complaints, and she initiated an administrative segregation log and monitoring. ECF No. 171-4 at 2.  However, Bynum was not moved to a cell until 3:00 a.m. ECF No. 178-4 at 6.

At roughly 6:50 a.m. the next morning, defendant LV Sergeant Larry Graves conducted an initial intake tour and noticed that Bynum had not completed the booking process. ECF No. 178-3 at 10.  He spoke with Bynum, who made comments that did not make sense and said he did not want to go through booking because he was being released. *Id.*  Graves advised Bynum that he needed to go through the booking process to be released. *Id.*  Bynum was "looking around like there was someone else in his room" and said he would not be medically screened. *Id.*  He did not respond to Graves' offer to use the restroom. *Id.*  Graves informed Bynum that if he needed to use the restroom, an officer walked by his cell every 15 minutes. *Id.*

1    Around the same time,[4] defendant LV officers Steven Cheney, Lafayette Henderson,

2    Matthew Szostek, and Graves entered Bynum's cell to secure another inmate named Mendoza.

3    ECF No. 178-3 at 7.  Bynum became distressed, stood up, and started pulling on his restraints.

4    *Id.*  Cheney observed that Bynum appeared scared that the officers were going to hurt him. *Id.*

5    Bynum said, "You're going to kill me" and, "Charlene, they're going to kill me." *Id.*  The

6    officers grabbed Bynum to sit him down on the bench and place leg restraints on him so that he

7    and Mendoza were separated. *Id.*  Henderson and Cheney held Bynum's upper torso down and

8    Cheney placed all his body weight onto Bynum's back. *Id.*  Defendant nurse Christopher Nehls

9    checked Bynum for any medical injuries from the use of force. *Id.*  No injuries were noted. *Id.*

10   Video footage of the morning shows that Bynum behaved in a distressed manner, pulling on his

11   restraints, banging his right hand on the bench handle, taking off his pants and underwear, and

12   eventually getting tangled in his restraints and falling on his back to the floor. Video 1 at 1:27-

13   5:20.  He remained on the floor for around five minutes before the same officers and Nehls came

14   in to help him back onto the bench. *Id.* at 5:20-11:17.  Graves stated Bynum needed to be

15   restrained to avoid "hurting himself or others." ECF No. 178-3 at 11.

16       At 9:35 a.m., officers removed Mendoza and brought in another inmate. ECF No. 178-4

17   at 7.  An hour later, Bynum was provided a meal, which he did not eat. *Id.*  He may have had

18   some milk that was included with the meal. *Id.*  That afternoon, Graves spoke with Bynum about

19   going through the booking process, but Bynum was not able to provide a clear answer. ECF No.

20

21

22   [4] Graves submitted an incident report on February 26 describing his interaction with Bynum that
     morning. ECF No. 178-3 at 8.  He reported that Bynum was involved in a use of force incident
23   earlier that morning. *Id.*  But video shows that the use of force incident occurred around the same
     time Graves said he spoke with Bynum.  It is unclear whether Graves spoke to Bynum before or
     after they placed leg restraints on him.

1  178-3 at 8.  Nehls evaluated Bynum's restraints. *Id.*  Graves then contacted psychiatric services
2  to see if Bynum could be evaluated by the oncoming shift. *Id.*

3          Bynum again started tugging at his cuffs and banging his wrist on the bench at around
4  10:20 p.m. ECF No. 178-4 at 7-8.  He slid to the floor and remained there for approximately
5  three hours. *Id.*  In total, Bynum was secured to a bench inside this cell for about 23 hours. ECF
6  No. 178-4 at 8.  There is no evidence that he ate food, drank water, or used the restroom during
7  this time, except possibly some milk. *See* ECF No. 178-4 at 6 (noting Bynum was inside the cell
8  but restrained in a way that he was unable to use the cell's toilet or sink); *see also id.* at 18-20
9  (Graves stating the intake sergeant is advised when an inmate needs to use restroom and
10  defendant LV Sergeant Lori Kelleher stating that if Bynum accepted an offer to use the toilet,
11  she would have likely been advised so she could facilitate the request).

12          At around 1:40 a.m. on February 27, non-defendant LV officer Dennis Farmer and
13  Kelleher retrieved Bynum to take him to the intake medical office. *Id.* at 8.  While in the
14  hallway, Bynum dropped to his knees. *Id.*  He was helped to his feet, walked a bit more, then fell
15  to his knees and laid on the floor in front of the medical room doorway. *Id.*  He was assisted to a
16  seated position on a chair in the medical office. *Id.*; *see also* Videos 3 and 4.  Video shows
17  Bynum was offered water twice while in the medical intake office, and he likely drank some of
18  the water. Video 4 at 1:30-1:40, 2:07-2:22.  Defendant nurse Barbara Buttino examined Bynum,
19  noted abrasions on his ankles, and he was subsequently moved by wheelchair to his isolation
20  cell. ECF Nos. 178-4 at 8; 171-6 at 3.  Bynum remained in that cell for about 37 hours,
21  unrestrained and with a mattress, cot, linens, and inmate uniform, until his cardiac arrest. ECF
22  No. 178-4 at 8.

23

There was no camera inside Bynum's cell. *Id.*  Record notes show that he was observed about every two hours by nurses who would initial their name next to their progress note. *See* ECF No. 171-6.  Further, according to the internal investigation report, officers observed Bynum approximately every 15 minutes. ECF No. 178-4 at 8.  And while Bynum's mental health observation sheet shows him generally being checked on every few hours, it appears he was not observed by a mental health nurse for 12 hours between 8:45 a.m. and 8:49 p.m. on February 27. ECF No. 178-17 at 31.  Meals were provided via a slot in his cell door. ECF No. 178-4 at 8. However, there is no evidence to suggest Bynum ate anything.  For example, at around 5:30 a.m. on February 28, Kelleher and another officer entered Bynum's sell to remove garbage and debris from the floor and Bynum's sandwich was uneaten. *Id.* at 20.  Apart from the previously mentioned instances, there is little to no record or notation of Bynum eating, drinking, or being prescribed or taking any medication.

Bynum appeared to be in mental distress throughout his time in jail.  For example, in the afternoon of February 26, Nehls noted that Bynum was disheveled, disorderly, inappropriate, insensible, psychotic, anxious, aggressive, and combative. ECF No. 171-8 at 2.  That evening, defendant mental health nurse Haydee Tolentino noted that Bynum was "disheveled, distracted, irritable mood, appropriate affect, delusional thought content present" and that Bynum was "currently in a psychotic state" and unable to speak with her. ECF No. 171-9 at 2.  And at around 11:30 p.m., defendant nurse Christina Schade noted that Bynum was anxious, aggressive, and yelling. ECF Nos. 178-4 at 10; 178-17 at 32.  At 6:00 a.m. the next morning, Schade noted that Bynum was lying naked on his bed. ECF No. 178-20 at 30-31.  She testified that she generally looks at previous progress notes to understand what is going on with a patient before she makes her own progress note. *Id.* at 32.  That evening, Buttino noted that Bynum was resting on a mat,

moving his legs, and talking to himself. ECF No. 178-5 at 10.  And Tolentino noted that Bynum was talking to himself. *Id.* at 14; ECF No. 178-6 at 21.  On the morning of the 28th, Buttino noted that Bynum was awake and talking to himself. ECF No. 178-5 at 14.

Tolentino testified that based on her mental health note, Bynum needed to see a doctor, but she could not recall whether she scheduled an appointment and her notes make no mention of it. ECF No. 178-6 at 28-29.  In her declaration attached to the defendants' reply, Tolentino stated that Bynum needed to see her supervisor, Dr. Greene, for a complete assessment and that Dr. Greene usually did not work on weekends. ECF No. 190 at 23-24.  She also stated that in her experience, CCS can care for and treat patients with psychological needs at its on-site facility. *Id.* at 24.  And she noted that if Bynum needed immediate attention, she would have referred him to the charge nurse and recorded that in her note. *Id.*  Bynum was admitted to the jail on a Thursday. *See* ECF No. 178-17 at 6 (noting that February 26, 2016 was a Friday).

On February 28 at 11:00 a.m., defendant nurse Francesca Noce took Bynum's vitals. ECF No. 178-19 at 19.  Cheney and non-defendant LV officer Kirtley accompanied Noce. ECF No. 178-4 at 13.  Cheney noted that Bynum was naked, his inmate uniform was stuffed in the toilet, and there was uneaten food and trash in the cell. *Id.*  He said Bynum was lethargic and did not speak, but when Noce attempted to remove the blood pressure cuff from his arm, he grasped it and held on so Cheney had to assist in removing it. *Id.*  Noce testified that she wrote that Bynum was "lying on floor agitated, BP 130 over 96, pulse 60, respiration is 80.  No acute distress. Patient continues to refuse medical screen." *Id.*  That afternoon at 2:45 p.m., defendant officer Jennifer Bradford observed that Bynum was sitting on the floor next to the toilet in a slumped posture and she informed other officers. ECF No. 178-3 at 5.  Multiple nurses responded to the "Code Blue" and began to attempt to resuscitate Bynum. ECF No. 178-3 at 3-4.  An ambulance

transported Bynum to Sunrise Hospital, where he was treated by doctors who observed he was suffering from multiple organ failure and a cardiac arrest. ECF No. 178-17 at 8-20.  Bynum had an open laceration on his forehead about three inches above his left eye. ECF No. 178-3 at 21. He also had a closed laceration about two inches above his left eye. *Id.*  And he had a closed laceration in his left eyebrow. *Id.*  The toxicology report showed that Bynum tested positive for opiates and cannabinoids. ECF No. 178-17 at 11.  He remains on life support. *Id.* at 7.

An internal investigation was conducted by LV.  Graves was the dayshift intake supervisor on February 26 and 27. ECF No. 178-4 at 17.  Kelleher was the nightshift intake supervisor on those dates. *Id.* at 19.  Kelleher stated that Graves usually provided her with a verbal briefing on each isolation inmate at shift change. *Id.*  She also stated that she did not attempt a restraint-free self-movement period with Bynum because he was unstable. *Id.* at 20. And she stated there are no logs, notes, or other methods to track how long an inmate has been secured to a bench. *Id.*   She did not fill out an incident report after her first shift indicating that Bynum was in restraints for over 12 hours, as required. *Id.* at 20.  The investigation found that Kelleher and Graves did not follow the jail's pre-booking directive which requires documentation of offers to use the toilet, drink water, and self-movement to inmates restrained for longer than 12 hours. *Id.* at 22.  The investigation found no evidence that Bynum was battered or abused while in custody. *Id.* at 21.

The mental health director, Dr. Greene, never conducted a review of Bynum's treatment. ECF No. 178-14 at 11.  He agreed that certain medical issues can cause or lead to mental health issues but he would defer to someone with medical training for a proper diagnosis. *Id.* at 14-15.

1   Charlene initiated this lawsuit, alleging the following causes of action[5]: (1) Fourth

2   Amendment excessive force against NLV officers; (2) state law battery against NLV officers;

3   (3) Fourth Amendment unlawful seizure against NLV officers and EMTs; (4) state law false

4   imprisonment against NLV officers; (5) denial of medical care under the Fourteenth Amendment

5   Due Process Clause against all defendants; (6) intentional or negligent failure to provide medical

6   care under state law against all defendants; (7) 42 U.S.C. § 1983 municipal liability against the

7   city of LV and the city of NLV; (8) negligent training and supervision under state law against the

8   cities; (9) loss of consortium under 42 U.S.C. § 1983 against all defendants; and (10) state law

9   loss of consortium against all defendants.

10   **C.  Expert Opinions**

11   The parties retained experts to opine on Bynum's care and what caused his injuries

12   resulting in his coma.  Defense expert Dr. Brian Swirsky, who is board certified in internal

13   medicine and cardiovascular disease, stated that the treating physicians did not "assign a cause to

14   the cardiac-respiratory arrest which would relate to deprivation of nutrition or hydration while at

15   the Las Vegas jail.  The treating physicians did not make a diagnosis of dehydration either." ECF

16   No. 171-12 at 7.  He also stated that nutritional deprivation for two days cannot medically

17   contribute to a cardiac-respiratory arrest. *Id.*  He concluded that the cardiac arrest was most

18   likely due to sepsis and could not be detected, prevented, or predicted by the jail medical staff.

19   *Id.*  Defense nursing expert Terry Fillman opined that Bynum's behavior was consistent with that

20   of someone under the influence of drugs and stated his "mental status was more likely than not

21   due to his self-induced opioid and cannabis abuse." ECF No. 178-8 at 2.

22

23

---

[5] For the sake of brevity, I categorize the defendants by job description or employer (e.g. "EMTs" or "NLV defendants").

1       Plaintiff expert Dr. Harry Duran, who is board certified in occupational medicine, opined

2 in his initial report that had Bynum been seen by a physician, "the psychosis could have been

3 controlled and the stress and dehydration which led to the Plaintiff's heart stoppage would have

4 been prevented." ECF No. 171-14 at 18.  He states that based on Bynum's behavior, reasonable

5 practice would be to have him seen and treated by a physician within two or three hours of

6 arrival. *Id.* at 17.  In his rebuttal report, Dr. Duran doubted the accuracy of Bynum's February 28

7 vitals which reflected normal blood pressure given that Bynum was noted to be agitated. ECF

8 No. 171-15 at 2.  As to Bynum's sepsis diagnosis, Dr. Duran stated that Bynum's "mental status

9 changes while in custody were indicators of a severe physiologic shift which resulted in

10 Bynum's heart stopping—again his status should have been evaluated in an emergency room

11 setting." *Id.* at 3.  And he opined that in his experience as the former medical director of the

12 Clark County Detention Center, proper observation and "prompt emergency referral for acute

13 mental status prevents patient complications from sepsis and other potentially grave causes." *Id.*

14 He concluded that the defendants' performance fell below the proper standards of care. *Id.*

15       Dr. Swirsky sent the CCS defendants' attorney an email to provide additional input after

16 reading Dr. Duran's report. ECF No. 190 at 30.  He stated that "[t]he hospital records support a

17 diagnosis of sepsis due to a urinary tract infection, and sepsis caused the cardiac arrest." *Id.*

18 **II.  ANALYSIS**

19       Summary judgment is appropriate if the movant shows "there is no genuine dispute as to

20 any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

21 56(a), (c).  A fact is material if it "might affect the outcome of the suit under the governing law."

22 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence

23 is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000); *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In ruling on a qualified immunity defense, I consider whether the evidence, viewed in the light most favorable to the plaintiff, shows the defendants' conduct violated a constitutional right. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).  If so, I then determine whether the right was clearly established. *Id*.  I may perform this two-step inquiry in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quotation omitted).  The plaintiff need not identify a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond

1  debate." *Id.*  I make this second inquiry "in light of the specific context of the case, not as a

2  broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "If a genuine issue of

3  material fact exists that prevents a determination of qualified immunity at summary judgment,

4  the case must proceed to trial." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

5       **A.  NLV Defendants' Motion**

6            1.  *Federal Claims Under 42 U.S.C. § 1983*

7                 a)  Excessive Force and Unreasonable Seizure

8       The NLV defendants argue that they used reasonable force when arresting Bynum, who

9  was actively resisting arrest and posed an immediate threat to safety. ECF No. 167 at 14-20.

10  They also argue that they had probable cause to arrest Bynum. *Id.* at 20-21.  And they argue that

11  they are entitled to qualified immunity because the officers acted reasonably given the

12  circumstances. *Id.* at 36.  Charlene responds that the defendants had no right to detain Bynum

13  because they had no proof that the alleged marijuana was his, so any force used was excessive.

14  ECF No. 182 at 5-6.  She argues that the jury should be allowed to balance the nature and quality

15  of the intrusion against the government interests, given that the purported crime committed was

16  not a serious crime in Nevada and would soon be legal. *Id.* at 6-7.  And she argues that the

17  defendants are not entitled to qualified immunity. *Id.* at 9-10.

18       "Determining whether the force used to effect a particular seizure is reasonable under the

19  Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the

20  individual's Fourth Amendment interests against the countervailing governmental interests at

21  stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citation

22  omitted).  To determine reasonableness, I look to the following *Graham* factors: (1) the severity

23  of the crime, (2) whether the suspect posed an immediate threat to the safety of the officers or

1  others, and (3) whether the suspect was actively resisting arrest. *Mattos v. Agarano*, 661 F.3d

2  433, 441 (9th Cir. 2011).  Courts "are free to consider issues outside the three enumerated [in

3  *Graham*] when additional facts are necessary to account for the totality of circumstances in a

4  given case." *Id.*

5        Regardless of whether an officer has probable cause to make an arrest, the reasonableness

6  of force used during the arrest depends on the circumstances (e.g., if the arrestee was forcibly

7  resisting arrest). *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 (9th Cir. 2015).  In the

8  end, the reasonableness inquiry is a fact-intensive one and there are no per se rules. *Id.*  Because

9  the reasonableness balancing test "nearly always requires a jury to sift through disputed factual

10  contentions, and to draw inferences therefrom," courts should grant summary judgment in

11  excessive force cases "sparingly." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d

12  1052, 1056 (9th Cir. 2003).

13        Viewing the evidence in the light most favorable to the plaintiff, no reasonable jury could

14  find that the officers used excessive force in arresting Bynum.  The officers searched Bynum's

15  home at his request and found what they believed to be marijuana in plain view.[6]  Bynum stated

16  he did not have a medical marijuana card, leading the officers to reasonably believe that he was

17  in illegal possession of marijuana.  They thus had probable cause to arrest him. *See United States*

18  *v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) ("Probable cause to arrest exists when officers

19  have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable

20

21  _____

22  [6] While Charlene argues that the defendants have no proof the marijuana was Bynum's and have
   not produced the marijuana in this action, the police report states that the defendants confiscated
   and tested 14.7 grams of marijuana, which was logged into evidence at the police station. ECF

23  No. 167-1 at 4-5.  Charlene presents no evidence to dispute that marijuana was found in the
   house or suggesting that it belonged to someone else.  And she does not claim she requested
   proof of the substance during discovery and was denied.

1  caution to believe that an offense has been or is being committed by the person being arrested.").

2  Bynum then resisted by attempting to walk away while the officers were questioning him,

3  another offense for which the officers had probable cause to arrest him. *See McKinnon v. State of*

4  *Nev.*, 618 P.2d 1222, 1222 (Nev. 1980) ("The crime of resisting a public officer is complete

5  when one willfully resists, delays or obstructs a public officer in discharging or attempting to

6  discharge any legal duty of [his or her] office.") (citing Nev. Rev. Stat. § 199.280)). [7]

7          However, these offenses would not be considered severe under *Graham. See Davis v.*

8  *City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (noting that trespassing and obstructing a

9  police officer were not serious offenses and the Ninth Circuit has found that a suspect was not

10  particularly dangerous when police were called for a domestic violence offense).  I thus must

11  consider whether the amount of force used was reasonable given that the nature of the offenses

12  was not severe.

13          The force used to bring Bynum to the ground was not excessive as he was resisting arrest

14  and there is no evidence the officers struck Bynum or caused significant injuries. *See Graham*,

15  490 U.S. at 396 ("Not every push or shove, even if it may seem unnecessary in the peace of the

16  judge's chambers, violates the Fourth Amendment.") (internal citation omitted).  Tonry testified

17  that he believed Bynum was reaching for his waistband, a common location for weapons.  Even

18  assuming there was no reason to suspect Bynum was armed, his hands were under his body and

19  not visible, so a reasonable officer would have taken precautions to secure his hands.

20          As for the use of the taser, Ray gave Bynum two warnings before deploying his taser and

21  Bynum continued to resist.  And Ray used the taser in drive stun mode only once.  The Ninth

22

23
──────────────
[7] Because the NLV defendants had probable cause to arrest Bynum, I grant their motion as to the unreasonable seizure claim.

15

1   Circuit has yet to opine as to what level of force is used when a taser is deployed in drive stun

2   mode. *Mattos*, 661 F.3d at 443.  But based on the circumstances of this case, no reasonable jury

3   could find that one use of the drive stun in these circumstances would constitute excessive force.

4         In sum, while Bynum's offenses may have not been considered severe, he posed a

5   potential threat to safety when he resisted arrest and placed his hands under his body.  He

6   continued resisting, which resulted in an injury to Tonry's hand, and he was tased once in drive

7   stun mode after being warned that he would be tased if he did not comply.  There is no genuine

8   dispute that the force was reasonable under the circumstances.

9         Even if a reasonable fact-finder could conclude that the NLV defendants' use of force

10   was constitutionally excessive, the officers would be entitled to qualified immunity as there is no

11   Ninth Circuit or Supreme Court precedent that would have put the defendants on notice that they

12   could not use some force to bring a suspect to the ground and deploy a taser one time in drive

13   stun mode when the suspect was resisting arrest.  In *Mattos*, the court found that a reasonable

14   fact finder could conclude that the officers used excessive force when they tased a pregnant

15   driver in drive stun mode three times over the course of less than one minute where the driver

16   refused to sign a traffic citation and get out of her car, posed no immediate threat to the officers

17   or others, and clutched her steering wheel. 661 F. 3d 446.  But the court held that the officers

18   were entitled to qualified immunity because at the time the precedents from sister circuits

19   rejected claims that the use of a taser constituted excessive force. *Id.* at 448.

20         The facts in this case are distinguishable from *Mattos* because Bynum was tased one

21   time, was resisting and placed his hands under his body out of the officers' view, and the officers

22   were dealing with a drug offense instead of a traffic violation.  Finally, Charlene has presented

23   no case law to refute the defendants' arguments that they are entitled to qualified immunity, so

1  she has not met her burden of identifying clearly established law.  Accordingly, I grant the NLV

2  defendants summary judgment on Bynum's Fourth Amendment excessive force and

3  unreasonable seizure claims.

4                            b) <u>Denial of Medical Care</u>

5          The defendants argue that they were not deliberately indifferent to a serious medical need

6  because the officers called for a medical evaluation at the scene after Bynum was placed in the

7  police vehicle and because the EMTs evaluated Bynum, who appeared competent and twice

8  denied any medical issues. ECF No. 167 at 26-27.  Charlene responds that (1) Bynum was

9  speaking rapidly and not in clear sentences, (2) there is no evidence that the EMTs assessed

10  Bynum because he is not included in the ambulance report, and (3) the defendants failed to take

11  Bynum to an emergency room for an immediate psychiatric evaluation. ECF No. 182 at 7-8.

12          To prevail on a denial of medical care claim under the due process clause of the

13  Fourteenth Amendment, a plaintiff must show:

14         (i) the defendant made an intentional decision with respect to the conditions under
          which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial

15         risk of suffering serious harm; (iii) the defendant did not take reasonable available
          measures to abate that risk, even though a reasonable official in the circumstances

16         would have appreciated the high degree of risk involved—making the
          consequences of the defendant's conduct obvious; and (iv) by not taking such

17         measures, the defendant caused the plaintiff's injuries.

18  *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).  "With respect to the third

19  element, the defendant's conduct must be objectively unreasonable, a test that will necessarily

20  'turn[ ] on the facts and circumstances of each particular case.'" *Id.* (quoting *Castro v. Cnty. of*

21  *L.A.*, 833 F. 3d 1060, 1070 (9th Cir. 2016) (alteration in original)).[8]

22  

23  ────────────────────────
   [8] While the parties do not mention post-arrest care, the Ninth Circuit has found that officers must
   provide objectively reasonable post-arrest care by, for example, calling for medical assistance or
   taking a suspect to a hospital if he or she has been injured while being apprehended. *See Tatum v.*

Charlene provides no evidence to support her argument that Bynum was not given adequate medical care. She instead relies on conclusory statements that because the ambulance report was incomplete, Bynum was not treated. But the unrebutted evidence shows that the officers called for medical assistance and the EMTs arrived on the scene and determined that Bynum was clear for transport to the jail. Charlene does not argue that the officers delayed calling medical assistance, only that Bynum was never treated or was inadequately treated because he should have been taken to the hospital.

Even if there is a triable issue as to whether Bynum received adequate care by the EMTs, there is no evidence that the defendants acted unreasonably in treating him. It is unclear what potential serious harm the defendants' conduct put Bynum at risk of. There is no evidence that Bynum's signs of confusion or potential mental health concerns, without more, would result in a risk of serious harm. EMT Nielson testified that Bynum was "making sense considering the situation he was in" and that he was concerned about why he was being arrested. ECF No. 167-4 at 11. And he testified that Bynum had no medical complaints, the EMTs saw no signs of any serious injuries, and Bynum denied injuries or pain. *Id.* Given the evidence presented, no reasonable jury could conclude that the defendants were deliberately indifferent to Bynum's medical needs. I grant the NLV defendants' motion as to this claim.

c) Loss of Consortium

The defendants argue that loss of consortium is not recognized as a § 1983 claim. ECF No. 167 at 29-30. Charlene responds that the Ninth Circuit has recognized that family members

---

*City & Cnty. of San Francisco*, 441 F.3d 1090, 1098-1099 (9th Cir. 2006). There is no genuine dispute that the officers called for EMT assistance after arresting Bynum.

1  have a liberty interest in companionship and a state actor's interference with companionship may

2  constitute a due process violation. ECF No. 182 at 8-9.

3        Courts are divided over whether a loss of consortium claim can be brought under § 1983.

4  *Compare Nichols v. City of Henderson*, No. 2:16-cv-01611-GMN-GWF, 2017 WL 3749497, at

5  *4 (D. Nev. Aug. 29, 2017), report and recommendation adopted, No. 2:16-cv-01611-GMN-

6  GWF, 2018 WL 1611189 (D. Nev. Apr. 2, 2018) (noting "because loss of consortium is a state

7  law claim for the loss of her husband's love, support, and services, it cannot be brought solely

8  pursuant to § 1983 because the claim is not based upon a deprivation of her constitutional

9  rights") *with Pajas v. Cnty. of Monterey*, No. 16-cv-00945-BLF, 2018 WL 5819674, at *11

10  (N.D. Cal. Nov. 5, 2018) (allowing loss of familial relationship claim to survive summary

11  judgment because spouse has a liberty interest in companionship and question of fact existed as

12  to whether prison official's deliberately indifferent conduct toward pretrial detainee's medical

13  needs shocks the conscience).[9]  But even if a loss of consortium claim exists, it could not survive

14  without Charlene first showing that the defendants engaged in unconstitutional conduct against

15  Bynum.  Because none of her claims against the NLV officers and EMTs survives, I grant the

16  NLV defendants' motion on this claim.

17        In sum, the NLV defendants did not violate the Bynums' constitutionally protected rights.

18  Because there was no unconstitutional action, Charlene cannot prevail on a *Monell*[10] claim

19

20  [9] *See also Forthoffer v. Fore*, 2018 WL 9782522, at *5, n.56 (D. Ala. Aug. 29, 2018) (spouse
could not bring his own loss of consortium claim under § 1983 and citing cases); *but see Estate*
21  *of Lopez ex rel. Lopez v. Torres*, 105 F. Supp. 3d 1148, 1160 (S.D. Cal. 2015) ("Defendant is
correct that the same allegations of excessive force giving rise to Lopez's claim, via his estate,
22  also give his spouse and children a substantive due process claim based on their loss of his
society and companionship.") (citing *Smith v. City of Fontana*, 818 F.2d 1411, 1419-20 (9th Cir.
23  1987)).

[10] *Monell v. Dept. of Social Serv. of City of N.Y.*, 436 U.S. 658 (1978).

1  against the city of North Las Vegas.  I grant the NLV defendants summary judgment on the

2  municipal liability claims.

3            2.  *State Law Claims*

4        The NLV defendants argue they are entitled to discretionary immunity on Charlene's

5  state law claims. ECF No. 167 at 37-38.  And they argue Charlene's claims for battery, false

6  imprisonment, negligence, negligent training and supervision, and loss of consortium fail on the

7  merits. *Id.* at 38-40.  Charlene responds that the NLV defendants' decision not to provide

8  adequate medical care does not fall under discretionary immunity. ECF No. 182 at 11.  And she

9  argues they acted in bad faith because Bynum was arrested in an abusive manner. *Id.*

10        The NLV defendant officers are entitled to discretionary immunity.  Just as her federal

11  claims fail, Charlene's state law claims fail because there is no evidence of misconduct, abuse, or

12  bad faith. *Falline v. GNLV Corp.*, 823 P.2d 888, 892 n.3 (Nev. 1991).  The officers were

13  exercising their discretion by determining how to arrest Bynum and how to deal with a suspect

14  who was resisting. *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1168 (9th Cir.

15  2014).  Nevada looks to federal case law to determine the scope of discretionary immunity.

16  *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007).  And federal case law consistently

17  holds that training and supervision are acts entitled to such immunity, so the city of NLV is also

18  entitled to discretionary immunity on the negligent training and supervision claim. *Vickers v.*

19  *United States*, 228 F.3d 944, 950 (9th Cir. 2000); *see also Neal-Lomax v. Las Vegas Metro.*

20  *Police Dep't*, 574 F. Supp. 2d 1170, 1192 (D. Nev. 2008), aff'd, 371 F. App'x 752 (9th Cir.

21  2010).

22        However, failure to provide medical care does not fall under Nevada's discretionary

23  immunity doctrine. *Martinez*, 168 P.3d 720 at 447-48.  To prevail on a negligence claim, a

20

1   plaintiff must show: (1) an existing duty of care, (2) breach, (3) legal causation, and (4) damages.

2   *Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1175 (Nev. 2008).   The defendants

3   argue they were not negligent because the officers immediately requested medical attention and

4   the EMTs adequately assessed Bynum and determined he was clear for transport to jail.   Even

5   viewing the evidence in the light most favorable to plaintiff, no reasonable jury could conclude

6   that the NLV defendants were negligent in providing medical care.   EMT Nielson testified that

7   Bynum denied any injures twice and that he did not appear confused or otherwise mentally

8   unstable.   Images show that Bynum had a cut under his right eye, but there is no evidence that

9   the cut required any specific medical attention that was not provided.   Charlene has presented no

10  evidence to dispute these facts.   Even if there was evidence to show a breach of duty, the

11  causation between the NLV defendants' conduct and Bynum's irreversible brain injury is too

12  attenuated and speculative to satisfy the third prong. Thus, the negligence claim fails.[11]

13         Finally, under Nevada law, loss of consortium claims are derivative of the injured

14  spouse's claims. *See e.g., Schmutz v. Bradford*, 129 Nev. 1150, 2013 WL 7156301, at *4 (Nev.

15  Dec. 19, 2013) (loss of consortium claims are derivative of wrongful death and negligence

16  actions); *see also Turner*, 180 P.3d at 1178 & n.31 (noting that a loss of consortium claim is

17  dependent on the success of the injured spouse's claim).   Because Bynum's claims fail,

18  Charlene's loss of consortium claim also fails.   Accordingly, the NLV defendants' motion for

19  summary judgment is granted.

20  / / / /

21  / / / /

22

23
─────────────────────────────
[11] The complaint alleges "intentional or negligent failure to provide medical care."   But because
the negligence claim fails, Charlene necessarily fails to provide evidence of intentional conduct.

**B.  CCS Defendants' Motion**

   1.  *Fourteenth Amendment Denial of Medical Care*

  The CCS defendants argue that Bynum did not have a serious medical need and there is no evidence that any individual CCS nurse made an intentional decision about Bynum's conditions of confinement that increased his risk of substantial harm. ECF No. 171 at 9-14.  And they argue that there is no evidence that the defendants' conduct caused Bynum's cardiac arrest. *Id.* at 14-15.  Charlene responds that Bynum was suffering from a serious mental health condition and that each of the CCS staff knew that Bynum needed to see a doctor and failed to provide Bynum with the care he needed. ECF No. 178 at 13-20.

  To establish § 1983 liability, a plaintiff must show that each defendant personally participated in the alleged rights deprivation. *Jones v. Williams*, 297 F. 3d 930, 934 (9th Cir. 2002).  And as noted above, *Gordon* sets out the correct "objectively unreasonable" standard for denial of medical care claims under the Fourteenth Amendment. 888 F.3d at 1124-25.  A serious medical need exists where failure to provide treatment "could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).  Deliberate indifference requires a showing of more than negligence and instead "something akin to reckless disregard." *Gordon*, 888 F.3d at 1125.

  Charlene presents no evidence from which a reasonable jury could find that any individual defendant acted objectively unreasonably.  For example, while it appears that Buttino observed Bynum on several occasions between February 26 and 28, Charlene offers no information on whether Buttino was aware Bynum was not eating, drinking, or using the restroom or what a reasonable nurse should have done under the circumstances.  Charlene also

22

does not disclose any policies that would indicate that the defendants failed to follow their standard practices or that the policies failed to protect detainees from serious harm.

Further, Charlene provides no information on what behavior warrants calling a doctor or psychiatrist or how long a detainee who is acting psychotic and refusing medical screening may be left in isolation before being treated. Defense nursing expert Fillman suggests that Bynum's behavior was a result of self-induced cannabis and opioid use. But I have no information regarding the medical standards of care for someone suspected of being on drugs. And Charlene points to no case law to suggest that any individual defendant violated Bynum's right to adequate medical care. Charlene thus has not produced sufficient evidence to demonstrate that Bynum's constitutional rights were violated by any individual defendant. I therefore grant the CCS and LV defendants summary judgment on this claim.

Although I am granting summary judgment in the defendants' favor, I am troubled by some of the facts in this case. Bynum displayed visible and consistent signs of mental distress throughout his time in jail. He was on his back on the floor, tangled in his restraints for three hours before he was assisted. Further, Bynum appeared unable or unwilling to drink, eat, or use the restroom for long periods of time. Bynum was also restrained, without access to move around or use the restroom or sink, for a total of 33 hours (10 hours at intake and 23 hours in the first cell). And when he was in his isolation cell, he was naked and talking to himself. Yet he spent three days without being seen by a doctor or a psychiatrist. That being said, to prevail on her deliberate indifference claim, Charlene must demonstrate that each defendant individually put Bynum at substantial risk of suffering serious harm and failed to take reasonable measures to abate that risk. Charlene fails to meet this burden as to any defendant.

/ / / /

1      2.   *State Law Failure to Provide Medical Care*

2          The CCS defendants argue that Charlene's state law claim for denial of medical care is a

3   medical malpractice claim subject to Nevada Revised Statutes § 41A.071; thus, her claim must

4   be dismissed because she did not attach to her complaint an expert affidavit. ECF No. 171 at 15-

5   19.  Charlene responds that she has presented a *res ipsa loquitur* claim so an affidavit is not

6   required. ECF No. 178 at 21-23.  And she argues that CCS does not qualify as a "provider of

7   health care" under the statute. *Id.* at 23-24.  The CCS defendants reply that Charlene's complaint

8   does not assert a *res ipsa loquitur* claim and she should not be allowed to amend the pleadings.

9   ECF No. 190 at 15-16.

10          Under § 41A.071, an action for professional negligence, including medical malpractice,

11  must be dismissed without prejudice if it is filed without an expert affidavit.  "Professional

12  negligence" is defined as "the failure of a provider of healthcare, in rendering services, to use the

13  reasonable care, skill or knowledge ordinarily used under similar circumstances by similarly

14  trained and experienced providers of health care." Nev. Rev. Stat. § 41A.015.  "Allegations of

15  breach of duty involving medical judgment, diagnosis, or treatment indicate that a claim is for

16  medical malpractice." *Szymborski v. Spring Mtn. Treatment Ctr.*, 403 P.3d 1280, 1284 (Nev.

17  2017).  To determine whether a claim is for medical malpractice, however pleaded, I "must look

18  to the gravamen or substantial point or essence" of the claim. *Id.* at 1285.

19          I have previously held that the affidavit requirement applies to claims against a

20  corporation contracted by a state entity to provide medical care and services to detainees. *See*

21  *O'Neal v. Las Vegas Metro. Police Dep't.*, No. 2:17-cv-02765-APG-GWF, 2018 WL 2088002,

22

23

1  at * 3 (D. Nev. Aug. 27, 2018).  The same reasoning applies here.[12]  There is no evidence that

2  the CCS defendants' treatment of Bynum was not based on medical judgments.  Because

3  Charlene failed to attach an expert affidavit to her complaint, I grant the CCS defendants' motion

4  on this claim as to the CCS defendants. *See Washoe Med. Ctr. v. Second Judicial Dist. Ct. of*

5  *State of Nev. ex rel. Cnty. of Washoe*, 148 P.3d 790, 794 (2006) ("Because a complaint that does

6  not comply with NRS 41A.071 is void ab initio, it does not legally exist and thus it cannot be

7  amended.").

8        However, the jail officers are not medical professionals so § 41A.071 does not apply to

9  them.  Because the LV defendants joined CCS and NLV's motions, and because the CCS

10  defendants' arguments do not apply to them, they have not yet had an opportunity to address

11  Charlene's state law denial of medical care claim, and Charlene has not yet had an opportunity to

12  respond.  As such, I will allow one final round of summary judgment motions so the parties can

13  address Charlene's intentional or negligent denial of medical care claim against the LV

14  defendants.  Alternatively, the parties may file the proposed joint pretrial order.

15  **III.  CONCLUSION**

16        I THEREFORE ORDER that the North Las Vegas defendants' motion for summary

17  judgment **(ECF No. 167) is GRANTED.**

18        I FURTHER ORDER that the Correct Care Solutions, LLC defendants' motion for

19  summary judgment **(ECF No. 171) is GRANTED.**

20

21  [12] The complaint does not state an action based on the *res ipsa loquitur* doctrine.  Further, "any
    res ipsa claim filed without an expert affidavit must, when challenged by the defendant in a
22  pretrial or trial motion, meet the prima facie requirements for a res ipsa loquitur case" by
    presenting facts and evidence "that show the existence of one or more of the situations
23  enumerated in NRS 41A.100(1)(a)-(e)," for example, where a foreign object is unintentionally
    left in a patient's body after surgery. *Szydel v. Markman*, 117 P.3d 200, 205 (Nev. 2005).
    Charlene has not, and cannot, do so here.

1    I FURTHER ORDER that by September 21, 2020, Charlene Bynum and the Las Vegas

2  defendants may file motions for summary judgment on Charlene's state law denial of medical

3  care and loss of consortium claims.  If a motion for summary judgment is filed, the proposed

4  joint pretrial order will be due 30 days after I rule on that motion.  If no motion for summary

5  judgment is filed, the parties shall file a proposed joint pretrial order by October 5, 2020.

6    DATED this 31st day of August, 2020.

7

8                                                    _____
                                                     ANDREW P. GORDON
9                                                    UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23